16705

HOWEY v. JORDAN'S, INC. *ET AL.*

(74 S. E. (2d) 216)

72

*Messrs. Williams & Parler,* and *James H. Howey,* of Lancaster, *for Plaintiff-Appellant,*

*Messrs. Gregory & Gregory,* of Lancaster, *for Respondent, Jordan's Incorporated,* cite: 

January 22, 1953.

PRUITT, Acting Associate Justice.

This case is before the court on appeal by the plaintiff from an order of his Honor, Joseph R. Moss, Circuit Judge, granting motion of the defendant, Jordan's, Incorporated, for a directed verdict. Upon this motion being granted plaintiff moved for a voluntary nonsuit as to the defendant, Crawford, which was granted.

We adopt the following clear statement from appellant's brief:

"The Complaint in this action alleges that on September 8, 1950, at or about Ten Thirty o'clock at night the appellant's intestate was killed in a collision between an automobile operated by J. S. Crawford, in which appellant's intestate was riding, and a truck of the respondent which was parked in the right-hand lane of U. S. Highway No. 521 headed in a Northerly direction. The complaint alleges concurrent negligence on the part of both the operator of the respondent's truck and J. Y. Crawford, as operator of the automobile. The pertinent facts, as shown by the testimony, show that at or about five or six o'clock in the afternoon the respondent's truck broke down because of mechanical failure some three or four miles North of the Town of Lancaster on U. S. Highway No. 521. The testimony shows that practically all of the truck was on the right-hand lane on the paved portion of the highway. The respondent's testimony is to the effect that appropriate flares were placed around the truck

but the testimony in regards to these flares is at variance. The car in which the deceased was riding was proceeding in the same direction as the truck was headed, and crashed into the rear of the truck, killing the deceased almost instantly. After refusing respondent's motion for a nonsuit at the close of appellant's testimony, his Honor, at the close of all testimony, granted respondent's motion for a directed verdict, holding that the testimony failed to show any negligence on the part of the agent and servant of Jordan's, Inc."

The complaint goes further and alleges in paragraph eight (8), subsection "P", as follows:

"(P) In that the driver of the defendant's, Jordan's, Incorporated, truck failed and refused to make any reasonable effort to remove said truck from the main travelled portion of the right-hand lane of said highway going north, or to have the same removed therefrom, when he knew, or in the exercise of ordinary care should have known, that the parking of said truck in said highway created a dangerous condition thereon, and that other vehicles traveling along said highway were liable to run into and upon said truck, particularly the motor vehicle in which Plaintiff's intestate was riding."

The only question involved in this case is: Did the Trial Judge err in directing a verdict for the respondent on the ground that the appellant had failed to prove any negliegnce on the part of the respondent's agent and servant?

The Statute law applicable or pertinent to this action is contained in Section 109, Act No. 281, Acts and Joint Resolutions, General Assembly, June 7, 1949, of the State of South Carolina, 46 St. at Large, p. 501, as follows:

"(a) Upon a highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon a paved or main traveled part of the highway when it is practicable to stop,

park, or so leave such vehicle off such part of said Highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle shall be available from a distance of 200 feet in each direction upon such highway.

"(b) This section shall not apply to the driver of any vehicle which is disabled while on the paved or main-traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position."

Section 162, Act No. 281, Acts and Joint Resolutions, General Assembly, 1949: "(a) Whenever any motor truck, passenger bus, truck tractor, trailer, semi-trailer, or pole trailer is disabled upon the traveled portion of any highway or the shoulder thereof outside of any municipality at any time when lighted lamps are required on vehicles, the driver of such vehicle shall display the following warning devices upon the highway during the time the vehicle is so disabled on the highway except as provided in subsection (b): 1. A lighted fusee shall be immediately placed on the roadway at the traffic side of the motor vehicle unless electric lanterns are displayed. 2. Within the burning period of the fusee and as promptly as possible three lighted flares (pot torches) or three electric lanterns shall be placed on the roadway as follows: One at a distance of approximately 100 feet in advance of the vehicle, one at a distance of approximately 100 feet to the rear of the vehicle, each in the center of the lane of traffic occupied by the disabled vehicle, and one at the traffic side of the vehicle approximately 10 feet rearward or forward thereof."

During the examination of the employee of the defendant, Jordan's, Incorporated, who was in charge of the truck involved in the collision from which this case originated, he testified as follows:

"Q. Did you ask him if he had anything in there that you could use? A. No, sir.

"Q. Did you try to borrow anything from him—a rope or chain or anything? A. No, sir.

"Q. Did you ask him if he had a telephone or knew where a telephone was? A. No, sir.

"Q. Now, how many people were with you when you first stalled up there? A. Three.

"Q. You and two others is what you mean? A. Yes, sir.

"Q. And shortly after that, Histron, I believe another truck pulled up up there? A. Yes, sir.

"Q. And they offered to help you? A. I didn't have no chain.

"Q. I didn't ask you that. I asked you if they didn't offer to help you? A. They asked if there was anything they could do.

"Q. Isn't that an offer of help? A. Yes, sir.

"Q. What did you tell them? A. I didn't have no chain.

"Q. Did you tell them you didn't have any chain? A. Yes, sir.

"Q. Well, how many were in the truck? A. I didn't get out to look. I didn't go up there to look."

Then further, in examination of this same witness, he testified as follows:

"Q. If he had three or four in there and you took your three, that would have been seven. Don't you reckon you could have budged that truck back down that hill? A. No, sir. There wasn't enough grade.

"Q. Well, did you try? A. No, sir, we didn't try.

"Q. Why didn't you try? A. It was a heavy load and the tires were slack a little, and you couldn't push it.

"Q. Well, if you didn't try to push it how do you know you couldn't push it? A. Take a trailer with a heavy load it is hard to push.

"Q. That is true, but— A. You can't hardly push it empty.

"Q. But you didn't try to push it? A. No, sir."

Then further, in this same witness' testimony, he testified as follows:

"Q. And how long had you been sitting up there at the time this wreck happened? A. Maybe two or three hours.

"Q. Well, was it raining at the time it happened? A. It was raining when I stopped, but after it happened it wasn't raining.

"Q. Where were you? Weren't you and the other boys sitting up in the truck? A. Yes, sir, it wasn't raining then.

"Q. You were just sitting in the truck? A. Yes, sir."

In the trial of the case, D. V. Snipes, a witness for the plaintiff, testified as follows:

"Q. All right, what happened then? A. Well, he come back to the store and wanted a penny box of matches to light up his lights with, and I said to him, 'You had better get that thing off the road. How come you didn't pull it off around on the side?' He said a fellow come along and offered to pull him, but he didn't have no rope to pull it, and I said, 'I had one you could have had if you wanted it,' and I said,' Somebody is going to run under that thing tonight and kill themselves right there.' He said, 'The partolman fixed the lights, and he said it was all right.' The truck would have been all right, I reckon, if he had stayed out from under it.

"Q. Mr. Snipes, tell me this: Is there a telephone up there there at your place of business? A. Sir?

"(Question repeated) "A. Yes, sir.

"Q. Just tell me up there who you know got a telephone in that vicinity? A. Mr. Williams over there got on up there.

"Q. What about you? Have you got one? A. My son has right there at me.

"Q. What about Mr. W. W. Helms—has he got one? A. Yes, sir.

"Q. How far do these people live from where this truck was parked? A. How far do they live?

"Q. Yes, sir, from where this truck was parked. A. You mean the ones that was in the wreck?

"Q. No, sir, how far do these people live that had the telephones from where the truck was stopped? A. Oh, they didn't live no piece. Just down the road and across the road. I could throw a rock that far.

"Q. Have you got anything around your place of business that could have been used to move this truck? A. I had a rope. I told him that when he come back. I said, 'Why, I got a rope here I would have loaned you to move it with.'

"Q. Did you have any kind of vehicle around there? A. No, he didn't have nothing then, I don't reckon. I had a pick-up truck there. I told him I believed it would have pulled it. He didn't ask me for it, you know.

"Q. Well, Mr. Snipes, to the best of your ability, you never did go up there to the truck, did you, sir? A. Not that night I didn't. I went the next morning.

"Q. All right, did you look from your store up there to where the truck was parked? A. Oh, yes.

"Q. Just tell me to the best of your ability where that truck was parked in relation to the hard surface part of the highway? A. Well, it was parked, I reckon, about 50 yards up above the store. There is a little state highway sign there. It was right up against it.

"Q. On what part of the highway was it parked? A. On the right going yonder way.

"Q. Was it parked on the dirt or the pavement or how was it parked? A. No, sir, I think he just got off on a little bit of tar and pulled over on the side of the pavement. I think he had two wheels off on it.

"Q. Which two wheels were those—the right? A. Yes, sir.

"Q. Where were the other wheels of the truck? A. They were over on the left right out in the road.

"Q. All right, sir, and you say you saw it about 5 or 5:30 when it was parked there? A. Yes, sir."

It would appear from this testimony that the agent of the defendant, Jordan's, Incorporated, made no effort whatsoever to move the heavy truck off the highway from the time it became disabled and the time

of the collision out of which this action arose, and that would require the submission of the question of negligence on the part of the respondent's agent to the jury, and in failing to do so the Trial Judge erred. It is the decided law of this State that ordinarily it is a question for the jury as to whether it was reasonably possible or practicable, within the meaning of Statutory provisions or rules of law, for one temporarily stopping a car (or truck) along the improved or main traveled portion of the highway for necessary purpose, to have removed it therefrom as required by the Statute.

It is also the law of this State, and is generally held, that the burden of proving the necessity or excuse of stopping on the main traveled portion of the highway or practicability of moving off such portion, within the meaning of the Statute above referred to, regulating stops on the highway, is on him who makes such stop. *Ayers v. Atlantic Greyhound Corp.*, 208 S. C. 267, 37 S. E. (2d) 737.

In view of the testimony above quoted we think it was sufficient to require submission of the case to the jury for determination as to whether or not the respondent, Joraan s, Incorporated, had successfully met the burden placed upon it by the decided law of this State. Therefore, it is the opinion of this court that the order of the Circuit Judge directing a verdict for the respondent should be reversed, and the case remanded to the Circuit Court of Lancaster County,

And it is so ordered.

BAKER, C. J., and STUKES, TAYLOR and OXNER, JJ., concur.